Ms. Finnegan is a civilian child abuse investigator who is employed by the Arkansas State Police, who allegedly encouraged a county law enforcement officer to exercise a seven-day probation    and 72-hour protective custody hold on minor children based on child victim interviews, as well as other information that was developed during a short four-day child maltreatment investigation that was authorized by Arkansas law. The district court denied Ms. Finnegan's claim of qualified immunity because there was no medical corroboration of the child victim reports of abuse and because a separate agency who was also involved in the investigation, the Arkansas Department of Human Services, did not believe that a protective custody hold was warranted. But on the other hand, we had county law enforcement and Ms. Finnegan, who had interviewed the children, and who believed that they did need to take immediate protective custody. This was a 12B6 dismiss motion, right? Yes, Judge, it was a 12B6. So your argument, well, would you concede that if there was reasonable suspicion or probable cause to go to a home and commence an investigation and the on-scene investigation refutes the existence of reasonable suspicion or probable cause to seize, the seizing party would not be entitled to qualified immunity? You've got a triable case. I believe that's correct, Your Honor. You must have reasonable suspicion. No, it has to persist through the investigation. Absolutely. Yes, Your Honor, I agree with that. And here we have investigators on the scene, the medical doctor who examined the kids and the kids themselves, all not denying, disclaiming the existence of reason to seize. Not all of them, Your Honor. Not all. I care about all of them. What we have at the scene. We're talking about whether we have not. It doesn't even have to be triable. It has to be a fact question apparent from the 12B6 record that warrants this case to go to summary judgment. And frankly, to me, that's a slam dunk for the reason I just stated. Well, Your Honor, I respectfully disagree. This would be the first time that this court has ever denied qualified immunity to a child abuse investigator who took immediate protective action. We're talking 12B6 qualified immunity. We're talking about all of the things that were told that this investigator did wrong that can be proved. That's correct. That is the procedural posture, Judge Loken. But the allegations and the complaints show. How many cases have we upheld 12B6 qualified immunity at a 12B6 stage for a child abuse investigator? I believe I can cite. Let me see if I wrote that particular distinction on 12B6. That's the critical one. I was trying to find a case, any case, where this court had denied qualified immunity to a child abuse investigator who had taken a protective custody measure based on a child report of abuse. So all of the cases that the Sandleys rely upon in their brief, as well as the single case that was cited by the district court below, involved confidential informant statements, involved other kinds of evidence. Whereas here we had one of the Sandleys' children, he was a 16-year-old boy, who the plaintiffs affirmatively allege repeatedly in their complaint that their child was being interviewed during the conduct of this warrant, the search for this mineral solution substance that a doctor at Arkansas Children's Hospital had told investigators was potentially a fatal or harmful substance. It was poisonous. They were searching for that substance on the scene, and they were investigating and conducting interviews of all the children separately from their parents. I'm just assuming your answer for going on and on and on in other directions is you don't have a case that I asked you about. Absolutely not, Judge Loken. I asked you for a 12B6 ruling involving a child abuse investigator that supports your assertion we've never done that. I've got, let's see here, four cases, KD v. County of Crow Wing. Let me see if I can. The distinction on whether it was 12B6, if I could look while my opposing counsel, I'd love to come back and revisit and see if I can cite a specific case. The situation on 12B6, but in this case, the complaint alleges facts to show that Ms. Finnegan had reasonable suspicion. It certainly wasn't Manzano. The lead case in your brief, that's a summary judgment case. That may be true, Your Honor, and Manzano perhaps did involve a factual allegation in the complaint that the child victim reported, made detailed allegations of abuse to investigators. Investigators should be entitled... Wait, who's the child victim? Jonathan Stanley was the child victim who initially brought his allegations to... Who's an adult? No, sir, he was a minor. How old? 16 years old. And he made the initial reports to family friends who then reported it to the police, who then interviewed him. I understand all that, but the question is, what did they learn in the five hours they were there? Ms. Finnegan interviewed, according to the complaint, Ms. Finnegan interviewed Jonathan herself. Previous to that, there were no allegations that Ms. Finnegan, my client, had any direct involvement with Jonathan Stanley. But Jonathan Stanley was interviewed... The allegation is she controlled the seizure. The allegation is that she interviewed him, and during the course of the interview, he repeated all of his allegations of abuse, which included... The allegation was that she and the county sheriff, between the two of them, controlled the seizure. That's what they allege that Ms. Finnegan encouraged. This is 12b-6. Yes, Your Honor, 12b-6. Okay, we accept the truth of that. She was responsible, for purposes of this argument, for the seizure. Whether that was in her job description or within her statutory... Forget it. Sure, that's what they allege. She controlled it. What they allege over and over again was that the Garland County Sheriff's deputy made the decision. He made the decision to remove the children. They repeat that throughout pages, I think, 12 to 13 of the appendix, shows their allegations and the complaint. But nevertheless, I do agree. They allege that Ms. Finnegan encouraged the county sheriff's deputy to seize the children, and that she did that based on her interviewing... There during the five hours? Sir? Was John S. there during the five hours? Yes, according to the complaint, Jonathan Stanley was interviewed during that five-hour period and repeated all of his stories, I think they say, of abuse and neglect, and that they bought it hook, line, and sinker. They affirmatively allege in their complaint that child abuse investigators believed Jonathan. And under these circumstances where we have a child victim who is sitting face-to-face with an investigator who says, my father is poisoning me, my father is striking me, he's piping these solutions, this mineral solution, through our schoolhouse, investigators should be able to... How soon after that report was the seizure done? It was that same night, Your Honor, within a matter of an hour. So was there any investigation as to the injury to Jonathan, either from the poison or from beatings or strikings? I believe that Jonathan was examined according to the complaint. Again, we're on 12B6. But I believe that Jonathan was examined by a medical doctor. But this case is very similar to the Manzano case where a child abuse investigator did not have reasonable suspicion of child abuse. There was a medical evaluation before the seizure? In this case or in Manzano? This case. In this case, I believe according to the complaint, contemporaneous with ongoing interviews with Ms. Finnegan, there were doctors on the scene who did not find any immediate signs of renal failure, for example. But then the record shows, the attachments to the complaint show, that even after that the children had to get emergency evaluations at Arkansas Children's. Were there wounds or bruises? Not according to the complaint. There was no physical signs of abuse. But just like in the Manzano case where the court held that there was not even a constitutional violation under similar circumstances because incidental actions taken in pursuit of a child abuse investigation, such as in that case there was an investigator who made a recommendation to a child's mother with a little toddler who herself could not make a report of abuse. But based on the mother's suspicions of abuse, the investigator in Manzano told the mom, go ahead and obtain a protective custody order, an emergency order from the court. The father later sued the investigator and said, investigator, you didn't have any reasonable suspicion that I was abusing my child. You had no medical corroboration. In that case, you didn't even have a child victim report. The court still found that the investigator was entitled to qualified immunity because there was not even a constitutional violation. The opposing counsel says that the DCFS people on the scene said there was no basis to seize. Is that part of the record? Is that alleged? I believe it is part of the record. There was DCFS on the scene. We have the medical doctors and we have the DCFS on the scene for the five hours. All are part of the five hours at the end of that process saying there's no basis to seize. And we have a seizure. Some of them said that and some felt that there was. And we're talking 12B6. There is no disputed issue of fact that by the end of the investigation, the apparent suspicion or probable cause to seize had dissipated. I submit that the allegations in the complaint show that there had been credible allegations that the investigators believed. The Garland County Sheriff's Department official believed Jonathan Stanley. Catherine Finnegan believed Jonathan Stanley. There are no allegations that DCFS were part of the complaint. Why do you think Fourth Amendment cases sometimes turn on whether there was a reasonable investigation for what the officer did upon arriving at a scene that looked suspicious or worse? Some cases say that, no, you get qualified immunity even if you didn't investigate. But then there are other cases saying, no, part of your Fourth Amendment responsibilities is given what you came upon to investigate. Here there was an investigation. And it produced highly, according to the allegations in the complaint, highly controversial, disputed results. We had three of the eldest children. The Stanley's, I believe, the complaint alleges they have seven children. They're three eldest children over a course of a short three- or four-day investigation period. All told investigators the same types of allegations about abuse. There was an adult child who confirmed that their dad used the MMS. There was a sample of the solution. I would like to save my remaining few minutes for rebuttal. Thank you so much. Thank you, Ms. Merritt. Mr. Churchwell. Thank you, Your Honors. May it please the Court. This is my first appearance in any federal court of appeals, and I've got to tell you I'm thrilled to be here for several reasons. One is I believe this is the first time I've been in front of jurists that actually want to hear this issue in a case like this. 12B6, we have to remain within the four corners of the complaint. And Ms. Merritt is masterful in her use of the language. Well, Counsel, one thing she points out is that your allegations include facts that they claim justified the actions of when they believe a child victim of abuse that that provides probable cause to take action. What's your response? She continues to say that. And that's why I say her use and her command of the English language is masterful because she says things that simply aren't there. Not that she's making up facts. Well, she did about the oldest child, but that's the danger. I submit to you that Kathy Finnegan still believes Jonathan Stanley. Today, she still believes that she did the right thing. An allegation is not evidence. And that's what's dangerous when you have a state agency with unchecked authority and zealousness to go after they really, really believe they're saving children. But when you seize a child and it's unwarranted, when all you've got is an allegation, you're running the risk of every impetuous child or every child that has a bone to grind with his father for whatever reason picking up that phone and calling DCFS and having an investigator come out and believe them. Now, Jonathan wasn't the only child that was taken. They have 10 children. The youngest was about two years old. That child had never spent a night away from home. These children are homeschooled. They grow their own food. This was a close-knit family that has values that are different than the rest of society. They didn't just take Jonathan. They took all of the children. The children were terrified. The children are still traumatized from it. Within three days, they were placed in public school. This mother and father sacrificed their entire life for this way of life. The kids aren't over it yet. So, when they rush in, just because they believe something, there was no corroborating evidence. Ms. Merritt continues to say that there was corroborating evidence. Well, Jonathan's sister repeating Jonathan's allegation is not corroborating evidence. There's nothing independent about it. It's simply a repeat of Jonathan's allegations, and that's all they had in this case. Let me interrupt your turn. In your brief, you point out all the things that Ms. Vinnigan omits from her argument. But what did she know? What was the basis of her belief that this action was necessary to protect these children? What did she know, and when did she know it? Put it that way. There are exhibits, Your Honor, to the complaint that show the very next day. Now, the seizure was premeditated. The seizure was going to happen before she ever laid eyes on the children, and that's admitted. If you go to the appendix... And what prompted it again? What prompted the seizure? Right. The phone calls from the neighbors and the acquaintances of Jonathan, who believed Jonathan also. Jonathan manufactured a chemical that had everybody... What did the neighbors inform the investigators? The very same thing that Jonathan did. What he did is he... I believe that he pulled the statute, 12-18-103, that lists all of the elements or all of the definitions of abuse. Poisoning, burning, striking, okay? And he picked seven or eight of them. So he told them that the father was burning one of the girls with the chemical. Told them that his father was striking him in the face with a fist. Told them that if they wouldn't drink this solution, that he was brewing it and piping it through the vents of the home. Okay? We had 31 armed government officials that are supposed to be trained investigators. In fact, the state police, she claims that she's a civilian. Well, she's part of the Arkansas State Police. A lot of those are in a civilian capacity, but they still have active certification as law enforcement officers. That was created by the governor, and the language in the statute that created that said, Child abuse is a crime. It's a serious crime, and therefore it should be investigated by experienced law enforcement. And that's where the state police came about. They say they're civilians so that they're not subject to the restrictions of the constitutions, the Arkansas Constitution and the U.S. Constitution. He can't go in a home and seize people and interrogate them without satisfying the warrant clause. Okay? The warrant clause requires... There was a search warrant in this case. There was, but all the warrant authorized them to do was look for this chemical, and if they find it, seize it and take it back to the station. That warrant did not give them the right to seize a child. And Judge Loken is correct. If you've got 31 people, a medical doctor, a coroner, the chief undersheriff, okay, Arkansas State Police Crimes Against Children Division, there were three Division of Children and Family Services supervisors there. They were there for five hours. They found nothing. There was no corroborating evidence. There was no physical evidence. Then the question comes back, what was the basis of their appearance on the scene? The allegations that came from Jonathan and Jonathan's adult friends that had called, I believe they called. We haven't been able to do discovery yet. I did cross-examine all of these people in the appeal of the child maltreatment registry. There were 21... Well, that's all after the fact, isn't it? Yes. What did they know at the time they went out there, Ms. Finnegan and her... There's a policy within the State Police Crimes Against Children Division. Well, it may have been an overreaction. Oh, they knew nothing. Yeah, in retrospect, it looks like an overreaction, 31 people, all this for one family. Senator, I don't know if they thought they were going to find... Where are the other 31? Where do they stand in this case? They've all been granted summary judgment. All of the state actors were granted dismissal 12B600 sovereign immunity in their official capacities. I had John Doe's named because I don't know who in the Department of Children and Family Services is actually... Well, it seemed like an outrageous after-the-fact thing. But the other side of the coin is, suppose, just suppose some of these allegations had been true, and Ms. Finnegan would have said, we don't have enough, I can't believe this kid. We'll let the chips fall where they may. I would love for that to happen one time, but it doesn't happen. The state police... It's never happened. It's never happened. That's never happened. In Arkansas, it's never happened in the years that they've failed to show up when they should have. You mean that they failed to seize a child? Or that they failed to take protective action in the light of plausibly persuasive reports. One child abuse investigator pled guilty to fabricating evidence in 43 of her cases, and that was a case of where she said she went out and checked on the kids, but she didn't. So there's two extremes. There's either they don't do anything and they lie about it, or they come to some place and she just knows that there's something wrong, even though she can't put her finger on it. Or they hear about it but decide, well, we don't think it's serious enough, and in retrospect, they should have taken it seriously. Right. This is a very extraordinary case. Well, it may be, but we're making law for the general run of cases, not the extraordinary case, do we? Right. Here's the danger in sanctioning her behavior. If we sanction her behavior, there's not a family in this state of Arkansas that's safe, because if all it takes is a child making an allegation... Well, that's one of those hyperbolic statements that sounds better than it really is. Right. But here's where the... ...except the clearly or plainly incompetent or those that are acting ultra virys and they know they're violating the law. So what's your best case for the clear establishment here of a law? What case shows that someone functioning in the role of the defendant here would have been on notice that taking these children at this time would be impermissible under the Constitution? Actually, some of the defendant's cases do. Now, Manzano is not even in the same universe. I didn't understand a word you just said. Well, I'm sorry. May I get a drink? My mouth is very dry. Sure. Thank you. Manzano is one of her lead cases. She keeps claiming that all Investigator Finnegan did was make a recommendation for the removal of the children. Wait, the question is your best case. Oh, my best case. And the Supreme Court has given us direction in recent years and months that we can't use the general high standard of... We have to have a case that's on point that shows a person in the position that is seeking qualified immunity that indicates you should know better. It puts them on notice. It has to be beyond debate for you to prevail. Correct, but not on all four points. It has to put the official on notice that what they're doing is violating the law. In this case, it's almost... What's your best case? I'm waiting for the answer. Okay. We cited a whole bunch of them. We like... Ripson is good. Ripson was a case where the mother and her estranged husband, the father of the baby, were in a custody dispute. She made allegations or she claimed that the child made allegations. They called it corroborating evidence when her boyfriend repeated those allegations. And the police officer went out and seized that... Or actually went out and arrested the father and seized that child. See, in Manzano, there was never a seizure. The government didn't get involved. In Manzano, that investigator actually did make a recommendation. The mother went and hired a private attorney or went to a prosecuting attorney and got an order of protection. The child never left the custody of the parent. Here, we have a seizure where all of these children become wards of the state. Wiseman is a good one. Heartland is a good case. Heartland in Missouri was a group home that had numerous children. And there was an axe to grind with the child abuse investigators against this group home. And I think it was probably a contract dispute. But they made up allegations and went out there and seized those children. Now, reasonable suspicion is such a low burden. Do we have those facts here? Yes, yes. Here's what it is. And that's in the complaint? Yes, yes. The complaint clearly states, this is a case that you shouldn't have had to have 31 experienced investigators to pull up and go, there's nothing here. This is a case where I think Barney Fife alone would pull up and say, something's wrong. If we have these outlandish allegations in such quantity, we've got burning, striking, poisoning. There were 21 true findings that Ms. Finnegan found. Every single one was overturned. There wasn't sufficient evidence. I thought they had a sample of this MMS. No. And I went to a lab, and the lab said, yeah, this can be hazardous stuff. Never went to the lab. Here's the thing. Pardon? No, sir, never went to the lab. Jonathan. Somebody opined that. It's not correct. It's not pled. It was never returned with any type of chemical analysis whatsoever. And that's one of the reasons that the poisoning true finding was overturned. Because one of the elements is, you either have to have the parent admit, or you have to have... A child abuse expert said it was toxic. Yeah, but she did a 15-minute Wikipedia search. Under my cross-examination... Wait, wait, wait. What's in the 12B6 record? Is that outside the record? No, that's in the record. I allege that all she knew about it was what she found in a 15-minute Wikipedia search. That's what they want off of. And she also admitted that even water in sufficient quantity can be poisonous. So there was nothing in the record whatsoever that they had any chemical analysis of what this substance was. That, as they admit, the police officer was handed that by somebody that said they think that it came from the house. Because that's what Jonathan said. I don't know what Jonathan made. But they never did any investigation. None of the police departments ever went out and bought MMS. Why don't you stick to the record? That's in the record, Your Honor. How? Your complaint talks about they never did this and they never did that. No, the complaint clearly says that there was never a chemical analysis. All right. Okay. Now we're talking about 31 officers went out there and none of them ever did anything before they got there and blah, blah. I can't imagine. I haven't read your complaint, but unless it's 200 pages, it doesn't... It's 54 pages. It doesn't equate with a summary judgment record. I'm sorry, Your Honor. You're arguing like there's a summary judgment record here, your side of a summary judgment record. So is opposing counsel. There was an extensive record. Before we filed this lawsuit, I went to many hearings. Wait, wait, wait. There's an extensive record on appeal? No, on the maltreatment appeal. We have a 12B6 record on appeal. And you folks have all lived this case forever and ever, and you come up here and completely lose sight of the limited pleadings basis upon which we have to decide the case. That's right, Your Honor. And if we stick to the record clearly, this is not a case where qualified immunity should come in. It's going to come in, even if we affirm. It's going to come in at least two more stages. Understood. Summary judgment and trial. I misspoke. To what extent should our view of the case be influenced by the fact, if at all, that the district court did grant her summary qualified immunity on at least three bases? I think that we're going to see those again. They granted qualified immunity for perjury and fabrication of evidence in order to remove these children. The Ninth Circuit just heard that issue, and Judge Trott said that he was dumbfounded. Wait, wait, wait. We're going to hear that again? I hope so. I hope I get to appeal that at some point. And we have a different standard, too. We're looking at this under reasonable suspicion. The other circuits do it under probable cause. The other circuits, the Ninth Circuit, they require a search warrant before you can seize children because child abuse investigations. Save that for your search petition. Yes, Your Honor. To what extent should we on our court be guarded against taking into account, according to your brief, that Mr. Slayton and Finnegan have publicly stated that they don't care what the evidence is all about. Let them appeal. In other words, are they sort of taking the position that I'm the jury? Let somebody else decide? Yes. Yes, Your Honor. And to what extent do we at the appellate level say those are improvident statements and maybe these people shouldn't be working for the state in any capacity? But are they so extreme that they undercut any finding that she had reasonable suspicion to think that those children were in need of protection? Under Major Slayton's, he was a captain then, under Major Slayton's command, seven out of ten true findings that were appealed in Garland County where she worked were overturned on appeal. We overturned all 21 here statewide. That's in the record on appeal? No, Your Honor. It's not. I apologize. I agree with Judge Wolman in that this is not a slippery slope. This is a straight fall to a bottomless pit as far as when you're talking about the right to direct and control the upbringing of your children. There's no more fundamental liberty interest in the world than that. But again, to adopt your position or the district court's position, we have to say that this woman was asking out of ulterior motives rather than out of the goodness of her heart or not the goodness of her heart but rather from any reasonable belief that these children needed her intervention. I don't think that's why she does it. And I don't think that it's an ulterior motive. I think that it is a policy that if they feel and both of them were quoted as saying this by different witnesses and I'm not off the record now, Judge Logan, it's in my complaint. If they think that you're guilty, they're going to find true and then you can just appeal it. Okay? And if that's the basis of it, if that's the record, then you may very well prevail. It is in the record. We have witnesses. But right now, of course, they were granted qualified immunity under a 1979 case, Myers v. Bull, where it states that when an official testifies, they're not acting on the color of law. Let me interrupt again. I'm using your time. I've been out for a long time now. I'm using my colleague's time, which I will hear about perhaps. But anyway, no, in all seriousness, is there anything in the record whatsoever that support any suggestion that Ms. Finnegan had some sort of bias against the type of lifestyle that these children were being raised in? Absolutely. And, in fact, there's an e-mail attached to this complaint that is they hid this. It took a state senator to find it. The supervisor that was in charge of this investigation, the very next day, the children were seized on January 12th. On January 13th, she sent an e-mail to the state police and all of the other supervisors that said upon staffing with Tom, this case feels like the ultimate violation of a family's freedom to live their own culture. This is DCFS saying this. We are continually getting SDM classes and training and understanding how culture impacts those decisions. It is apparent to me that this family has its own unique culture. They homeschool. Indeed, they don't like that because they can't go to school with these children. So, yes, this is their admission from DCFS that they do not like people that don't have kids in school because they don't have access to them. They do not like people that don't practice modern medicine. Now, this doctor looked at all of these kids, and every one of them had nothing wrong with them. They were happy. They were healthy. He said, I don't find any of these symptoms. And that's what makes the seizure even that much more egregious. Not only was there corroborating evidence, as they allege, and it was evidence to the contrary, that there's nothing here. And when you've got that many allegations, you're going to find something when you've got 31 people out there looking. And Senator Terry Rice. Churchill, your time is expired. Thank you. I apologize. Ms. Merritt, your rebuttal. Judge, I'd like to direct the court to pages 48, 49, and 50 of the appendix. That goes back to all of your questions about what did Ms. Finnegan know at the time that she participated in this investigation at the Stanley home on the evening of January 12th of 2015. The search warrant that was signed by Judge Lynn Williams in Garland County Circuit Court on page appendix 48, as well as the affidavit for the search warrant that was sworn out by Sergeant Mike Wright of the Garland County Sheriff's Department, provides in great detail the information that Ms. Finnegan knew going onto the scene. The allegations in the complaint repeatedly explain that during the search on January 12th, 2015, on appendix page 12, paragraph N, during the five hours that CACD and GCSO commandeered the Stanley home, Jonathan Stanley was telling his stories to defendants in a vehicle parked outside the residence. He made all of the allegations as stated in the complaint. Again, the allegations about burning, striking, malnourishment, educational neglect, and more, as well as numerous others. So on this record, this complaint alleges that Jonathan Stanley was telling Ms. Finnegan and the other investigators all of these allegations during the conduct of the search. And these experienced investigators and law enforcement officers bought it, in their words. They believed him, Your Honors. They believed a 16-year-old child. When we are talking about child protective service workers who are charged with a very delicate and difficult task of investigating child abuse and neglect allegations, of talking to children, talking to parents, gathering all the information they can. It was a warrantless seizure of the children, right? There was no warrant that authorized seizure of the children. The seizure of the children had to be based upon what they found while searching for the chemicals. The seizure of the children had to be based on what they found during their investigation. I explained in my brief, and I've got very little time left on that. You have time to answer the question. But the Arkansas state statutes provides authority to, not to Ms. Finnegan, again, but I don't know that that's particularly relevant. I agree with them on that. But to the law enforcement officers or to the Department of Human Service workers, to take the children to exercise a 72-hour protective custody hold if they're in imminent danger. And so based on the information that was gathered during the interviews on the scene on January 10th, Ms. Finnegan, Investigator Finnegan, believed Jonathan Stanley. She believed him. And there is not one case that the district court was able to cite that the Stanleys have cited or that I've been able to find where this court has ever denied qualified immunity to an investigator who made a decision based on a child's report of abuse. Were chemicals seized? Were chemicals found and seized? According to the complaint, chemicals were found and seized on the scene. Yes, Judge. And so I've cited a number of cases in my briefs, but I've found even more that I could submit a Rule 20. You answered the question. Time's up, yeah. Okay. Thank you, Ms. Merritt. Thank you, Your Honors. The court thanks both counsel for providing argument to the court this morning in the briefing which you've submitted. We'll take the case under advisement. You may be excused.